UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMICA MUTUAL INSURANCE CO., <br><br> Plaintiff, <br><br> v. <br><br> ISAAC RIVERA, JESUS RIVERA, CARMEN POZO-RIVERA and RYAN MORRELL, <br><br> Defendants. | Civil Action No. 17-10985-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                           November 19, 2018

### I.     Introduction

Plaintiff Amica Mutual Insurance Company ("Amica") has filed this lawsuit against Defendants Isaac Rivera ("Isaac"), Jesus Rivera ("Jesus"), Carmen Pozo-Rivera ("Carmen") and Ryan Morrell ("Morrell") (collectively, the "Defendants") seeking a declaratory judgment stating that Amica has no liability to the Defendants in connection with a negligence lawsuit against Isaac. D. 17. Amica has moved for summary judgment. D. 43. For the reasons stated below, the Court DENIES the motion.

### II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the

1

outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)) (internal quotation mark omitted). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

Generally in the insurance context, "[t]he proper interpretation of an insurance policy is a matter of law to be decided by a court, not a jury." Boazova v. Safety Ins. Co., 462 Mass. 346, 350 (2012); see Matusevich v. Middlesex Mut. Assurance Co., 782 F.3d 56, 59 (1st Cir. 2015) (quoting Atlas Pallet, Inc. v. Gallagher, 725 F.2d 131, 134 (1st Cir. 1984)) (explaining that "[i]n the insurance context, if the facts upon which liability is claimed or denied are undisputed, then 'the existence or amount of liability depends solely upon a construction of the policy, [and] the question presented is one of law for the court to decide'"). However, "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995).

## III. Factual Background

The following facts are undisputed unless otherwise noted. This action arises out of an incident that occurred on October 18, 2016 at the residence of Defendants Jesus and Carmen. D. 45 at 2. Jesus and Carmen own a single family home in Leominster, Massachusetts (the "Rivera home"). Id. Their son, Isaac, lives with them, including at the time of the incident in question. Id.; D. 45-3 at 3.

### A. Morrell's Injury During Isaac's Arrest

Prior to the incident on October 18, 2016, Isaac's girlfriend obtained a temporary restraining order against Isaac that was in effect until December 19, 2016. D. 45 at 3. On the afternoon of October 18, 2016, Isaac's girlfriend reported to the Leominster Police Department that Isaac had violated the terms of the restraining order. Id. In response, four Leominster officers went to the Rivera home looking for Isaac. Id. The officers were Officer Daniel M. Proietti ("Proietti"), Officer William C. Taylor ("Taylor"), Sergeant Ryan D. Malatos ("Malatos") and Defendant Morrell. Id.

When the officers arrived at the Rivera home, Jesus let them into the house and told them Isaac was in the shower. Id. Carmen was at work at the time and was not present. Id. Jesus told Isaac to dry off because the police were there to take him into custody. Id. at 3-4. The officers waited in the hallway outside the bathroom. Id. at 4. Initially, the officers asked Jesus to get clothes for Isaac while Isaac stayed in the bathroom. Id. Jesus told the officers he did not know where Isaac's clothes were and the officers agreed Isaac could return to his bedroom to retrieve his clothes. Id. Proietti and Taylor escorted Isaac to his bedroom where he got dressed. Id.

While in Isaac's bedroom, Taylor attempted to place handcuffs on Isaac while Proietti held Isaac's left wrist. Id. Isaac broke away from Proietti's grasp. Id. According to Isaac, Isaac

3

"panicked" and moved towards the living room. D. 47 at 2; D. 47-2 at 3. Isaac also testified that he "panicked" because the prospect of being arrested triggered his anxiety. D. 47 at 3; D. 47-2 at 6. It is undisputed that Isaac then ran from the bedroom towards the hallway and Morrell was standing in the hallway. D. 45 at 4; D. 47 at 3. According to Proietti, Isaac "rushed forward like a bull" toward Morrell and then down a narrow hallway toward the kitchen. D. 45-16 at 10. According to Isaac and Morrell, Isaac attempted to run past Morrell and other obstacles in the hall to get outside and escape. D. 47-2 at 12; D. 47-3 at 8. Morrell testified that as Isaac ran past him in the hallway, he grabbed onto Isaac, first on Isaac's side and then from the back. D. 47-3 at 3-4. Morrell further testified it was like a "bear hug." Id. at 3. According to Morrell, Isaac's momentum carried him and Isaac down the hallway and they "bounced off the walls towards the kitchen." Id. at 4. Malatos wrote in the police report that he grabbed the right side of Isaac's body while Morrell had the other side. D. 45-6 at 10. According to Malatos, the three men (Malatos, Morrell and Isaac) fell into the glass china cabinet in the hallway causing the glass to shatter. Id. According to Isaac, the glass in the cabinet broke after two officers "threw" him into the cabinet and he was "tackled." D. 47-2 at 7, 9.

During the struggle in the hallway, Morrell injured his hand, the injury at issue in this case. D. 45 at 4; D. 47 at 3. Morrell testified that "[his] hand was crushed into the wall leading into the living room." D. 47-3 at 6. The living room is at the opposite end of the hallway from where Isaac initially ran out of the bedroom. D. 47 at 3. According to Jesus, the hallway is very narrow and two people cannot fit side by side in it. D. 45-14 at 21.

Isaac testified that he did not see Morrell get hurt and does not know how Morrell got hurt. D. 47 at 3; D. 47-2 at 7-8. Isaac further testified that it was not his intention to injure Morrell or any police officer. D. 47 at 3-4; D. 47-2 at 10.

4

Isaac was ultimately subdued by Taylor using a taser gun and was arrested in the living room. D. 45 at 5. Morrell received medical attention for the injury to his hand at Leominster hospital. Id.

### B.     **Criminal Charges Against Isaac**

As a result of this incident, Isaac was charged with resisting arrest and assault and battery on a police officer, among other charges. D. 45 at 5. With regard to the charge of assault and battery, the criminal complaint states: "On 10/18/2016 [Isaac] did assault and beat Ryan Morrell, a police officer who was then engaged in the performance of his or her duties . . . ." D. 45 at 5; D. 45-7 at 3. Regarding the charge of resisting arrest, the complaint states:

> On 10/18/2016 [Isaac] did knowingly prevent or attempt to prevent a police officer . . . who was acting under color of his or her official authority, from effecting an arrest, by: (1) using or threatening to use physical force or violence against the police officer or another; or (2) using some other means which created a substantial risk of causing bodily injury to such police officer or another . . . .

D. 45 at 5; D. 45-7 at 3.

On January 12, 2017, Isaac pled guilty to the assault and battery on a police officer and resisting arrest charges. D. 45 at 5. During the plea colloquy, Isaac agreed with the District Attorney's recitation of the facts, which included the following statement: "When the officers went to place the defendant under arrest, he did violently thrash around and did resist arrest and during the course of that arrest, he did commit an assault and battery on Officer Morrell." D. 45 at 6; D. 45-11 at 8.

### C.     **Morrell's Civil Suit Against Isaac**

Morrell filed suit against Isaac in Worcester Superior Court on February 7, 2017 (the "Civil Action") in connection with the October 18 incident. D. 45 at 6; D. 45-8. The complaint in the

Civil Action claims a single count of negligence. D. 45-8. Morrell alleges Isaac "negligently resisted arrest causing [Morrell's] injuries." D. 45-8 at 3.

### D. Amica's Homeowner's Policy Issued to Jesus and Carmen

Amica issued a homeowner's policy (the "Policy") to Jesus and Carmen for the Rivera home with effective dates of August 20, 2016 to August 20, 2017. D. 45 at 6. Under the Policy, residents of the household who are relatives are covered as "insureds." D. 45-9 at 9. At the time of the October 18 incident, Isaac lived with his parents at the Rivera home. D. 45 at 2. The Policy includes a personal liability coverage limit of $300,000 per occurrence and a Medical Payments coverage limit of $1,000 per person. Id. at 6.

> The Personal Liability coverage clause of the Policy provides as follows:
>
> If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** . . . caused by an **occurrence** to which this coverage applies, we will:
>
> 1. Pay up to our limit of liability for the damages for which an **insured** is legally liable. Damages include prejudgment interest awarded against an **insured** and;
>
> 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the **occurrence** has been exhausted by payment of a judgment or settlement.

D. 45-9 at 25 (emphases in original). The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general or harmful conditions, which results, during the policy period, in . . . **bodily injury** . . . ." Id. at 10 (emphasis in original). "Bodily injury" is defined as "bodily harm, sickness or disease, including required care, loss of services and death that results." Id. at 9. Personal Liability coverage under the Policy does not apply to "**Expected Or Intended Injury**," which is defined as "**Bodily injury** . . . which is expected or intended by an **insured** even if the resulting **bodily injury** . . . [i]s of a different kind,

6

quality or degree than initially expected or intended; or . . . [i]s sustained by a different person, entity or property than initially expected or intended." D. 45-9 at 27 (emphases in original).

Jesus and Carmen submitted an insurance claim to Amica asserting that Amica has a duty to defend and indemnify Isaac in the Civil Action. D. 45 at 6.[1]

## IV. Procedural History

Amica instituted this action on May 30, 2017. D. 1. Defendants Carmen, Isaac and Jesus were defaulted on November 13, 2017, leaving Morrell as the only non-defaulted Defendant. D. 14. Amica has now moved for summary judgment. D. 43. The Court heard counsel on the pending motion and took the matter under advisement. D. 49.

## V. Discussion

Amica seeks a declaratory judgment affirming that: 1) Amica has no duty to defend Isaac in the Civil Action, 2) Amica has no duty to indemnify Isaac in connection with any claims arising out of or relating to the Civil Action, 3) Amica may immediately withdraw from the defense of Isaac in the Civil Action and 4) Amica is entitled to reimbursement of all payments made for the defense of Isaac in the Civil Action.[2] D. 17 at 7.

Amica argues that there are no issues of material fact in this case and that Amica is entitled to a declaratory judgment relating to its responsibilities in the Civil Suit as a matter of law. Conversely, Morrell argues that there is a dispute of material fact concerning whether Isaac intended to harm Morrell. Morrell asserts that Amica has failed to present evidence proving that

---

[1] Morrell also submitted a claim to Amica under the Policy to receive $1,000 in Medical Payments Coverage, but has since withdrawn that claim. D. 47 at 1; D. 47-1.

[2] In Amica's memorandum in support of its motion for summary judgment, Amica made a fifth request for a declaratory judgment that it had no duty to pay for Morrell's medical expenses under the Policy. D. 45 at 1. After Amica moved for summary judgment, however, Morrell withdrew his claim for medical expenses. D. 47 at 1; D. 47-1. The Court's analysis, therefore, is limited to the other four parts of Amica's requested relief cited above.

7

Isaac intentionally injured Morrell such that either there was no "occurrence" under the terms of the Policy or that Morrell's injury falls within the Policy's exception to coverage for bodily injury that was "expected or intended."

### A. The Arrest Report for Isaac and the Criminal Complaint Against Isaac

As a preliminary matter, Morrell has argued that two exhibits to Amica's motion for summary judgment are inadmissible and should be stricken from the summary judgment record. D. 47 at 2. One is the arrest report for Isaac, D. 45-6, and the other is the criminal complaint relating to Isaac, D. 45-7. Morrell alleges that both documents are inadmissible and not properly authenticated. D. 47 at 2.

As to the admissibility of the arrest report, Morrell contends the statements made by the officers in the police report constitute inadmissible hearsay. Id. Amica counters that the report falls under the hearsay exception for public records contained in Fed. R. Evid. 803(8). D. 50 at 2. That exception allows for the admission of:

> [a] record or statement of a public office if: (A) it sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8). In a civil case, police reports fall under the public records exception. Schwartz v. United States, 149 F.R.D. 7, 9 (D. Mass. 1993); accord Lubanski v. Coleco Indus. Inc., 929 F.2d 42, 45 (1st Cir. 1991) (citing Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 170 (1988)). In Schwartz, this Court also stated that "the burden is on the party challenging the validity of an official report to show that it is untrustworthy." Schwartz, 929 F.R.D. at 11. Because Morrell has neither offered any legal or factual reasons to depart from the reasoning in Schwartz nor alleged any circumstances to show the report lacks trustworthiness, the Court deems the report to be

admissible. As to the authentication of the police report, not only did Amica's counsel swear to its authenticity, D. 45-1 ¶ 8, but all of the officers whose narratives are included in the report also testified to the report's authenticity during their depositions, see D. 45-16 at 44-45; D. 45-17 at 34-35; D. 45-18 at 68-69; see also D. 50 at 4 (Amica noting that the report used in the depositions is the same as the one attached at D. 45-6). The Court, therefore, declines to strike the report from the record.

As to the criminal complaint, Morrell posits that it is inadmissible because it is not signed or dated and the affidavit of counsel is insufficient to authenticate it because counsel lacks personal knowledge of its authenticity. D. 47 at 2. Amica's counsel attests in her affidavit that the exhibit is a true and accurate copy of the criminal complaint she received from the Worcester District Attorney's Office pursuant to a public records request. D. 45-1 ¶ 10. Her affidavit satisfies the authentication requirements of the Federal Rules of Evidence that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Amica also correctly points out that the Court may take judicial notice of the criminal complaint. See Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990) (stating that "[i]t is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand"); Goguen v. Textron, Inc., 234 F.R.D. 13, 19 (D. Mass 2006) (explaining that "the Court may take judicial notice of documents filed in another court to establish the fact of litigation—though not necessarily for the truth of the matters asserted within those documents"). The Court, therefore, deems the criminal complaint to be properly included in the summary judgment record.

    **B.**    **<u>The Duty to Defend and the Duty to Indemnify</u>**

Amica argues that it has no duty to defend Isaac in the Civil Action nor indemnify him for any losses. The existence of the duty to defend depends on a comparison of the allegations in the Civil Action to those of the provisions of the Policy. "Any uncertainty as to whether the pleadings include or are reasonably susceptible to an interpretation that they include a claim covered by the policy terms is resolved in favor of the insured." Holyoke Mut. Ins. Co. in Salem v. Vibram USA, Inc., 480 Mass. 480, 484 (2018) (citation and internal quotation marks omitted). Here, the complaint in the Civil Action alleges a single count against Isaac for "negligently resist[ing] arrest causing [Morrell's] injuries." D. 45-8 at 3. The Policy states that Amica will "[p]rovide a defense at [Amica's] expense by counsel of [Amica's] choice, even if the suit is groundless, false or fraudulent . . ." for claims brought against an "**insured**" for "**bodily injury** . . . caused by an **occurrence** to which this coverage applies." D. 45-9 at 25 (emphases in original). Accordingly, the operative questions before the Court are whether Morrell's injury was caused by an "occurrence" covered by the Policy and, if so, whether the occurrence is otherwise excluded from coverage under the Policy because the bodily harm to Morrell was "expected or intended."[3] The duty to defend is "broader" than the duty to indemnify, Doe v. Liberty Mut. Ins. Co., 423 Mass. 366, 368 (1996), but for both duties the Court's "task is to match the complaint against the policy," Swift v. Fitchburg Mut. Ins. Co., 45 Mass. App. Ct. 617, 623 (1998) (citation and internal quotation mark omitted).

First, the Court must determine whether Amica is entitled to judgment as a matter of law that Morrell's injury did not result in an "occurrence" as defined in the Policy. Both parties rely on Massachusetts law construing the word "accident" to interpret the term "occurrence" in the

---

[3] A threshold question exists as to whether Isaac is covered by the Policy, which is in his parents' name. Morrell contends it is undisputed that Isaac is an "insured" under the Policy, D. 47 at 4, and Amica does not appear to contest this position.

Policy. The word "accident," in the context of insurance liability, means an "unexpected happening without intention or design." Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 83 (1984). The Supreme Judicial Court further held that "the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." Id. at 84. The Supreme Judicial Court has also noted repeatedly that "[n]egligent conduct cannot be intentional conduct." Waters v. Blackshear, 412 Mass. 589, 590 (1992) (citing Sabatinelli v. Butler, 363 Mass. 565, 567 (1973)). Because the Civil Action alleges negligence, which falls under the umbrella of injuries caused by "accident," the Court concludes that a reasonable jury could find that Morrell's injury was caused by an "occurrence" under the Policy. The Court, therefore, moves to the second part of the inquiry, which is the applicability of the exclusionary clause of the Policy to Morrell's injuries.

In Massachusetts there are two "strands" of cases examining the applicability of exclusionary provisions for "expected or intended" injuries. Hanover Ins. Co. v. Talhouni, 413 Mass. 781, 784 (1992). "The first strand is comprised of cases where . . . an intent to cause injury exist[s] as a matter of law due to the nature of the act." Id. For example, rape and forceful sexual molestation falls into this first strand. Id. (citing Worcester Ins. Co. v. Fells Acres Day Sch., Inc., 408 Mass. 393, 399-400 (1990)). For another example, pushing a person down the stairs causes injuries that are "expected" as a matter of law. Terrio v. McDonough, 16 Mass. App. Ct. 163, 169 (1983). The second strand is comprised of cases in which the insured's intent cannot be inferred as a matter of law and the parties submit the issue to a factfinder. Talhouni, 413 Mass. at 785. In such a case, "the dispositive question is whether . . . the [insured] intended, or knew with

11

substantial certainty, that some injury would result from his conduct." Id. (alterations in original) (quoting Kowalski, 914 F.2d at 304) (internal quotation marks omitted).

Amica argues that Isaac's intent to injure Morrell can be inferred as a matter of law and, therefore, falls within the first strand of cases. D. 45 at 14. Amica likens Isaac's actions to those described in Fells Acres, 408 Mass. at 393. Fells Acres involved an insurance claim for injuries caused by forced sexual molestation and rape. Id. at 399. In Fells Acres, the Supreme Judicial Court stated that rape was "indistinguishable from any other deliberate assault and battery," id. at 399-400, and that "child molestation and the injury caused by it are so closely tied as to be virtually inseparable. Except in the strongest of factual situations, intent to commit this act carries with it the intent to inflict the injury." Id. at 400 (internal quotation marks omitted). Amica contends that Isaac's "violent behavior," including charging "like a bull" into an officer and requiring four police officers to subdue him was "the equivalent of striking another in the face," as described in Fells Acres. D. 45 at 13. Amica also argues that this case is similar to Terrio, in which the defendant in an underlying case was alleged to have sexually assaulted the plaintiff and kicked her down the stairs. Terrio, 16 Mass. App. Ct. at 166.

Morrell counters that this case falls within the second strand of cases listed in Talhouni and must be resolved by a factfinder. According to Morrell, the exclusionary provision does not apply in this case because courts in Massachusetts have held that actions that were far more "inherently injurious" than Isaac's behavior during the October 18 incident were not intended or expected as a matter of law. D. 47 at 9. Morrell primarily likens this case to two of the cases the Supreme Judicial Court described as falling in the "second strand."

First, Morrell likens this case to Abernathy, in which a 16-year-old boy threw a piece of blacktop at a car, smashing the car window and injuring the vehicle's occupants. Abernathy, 393

12

Mass. at 82. The Supreme Judicial Court reversed the trial court's grant of summary judgment to the insurance carrier because, based on the admissible evidence in the record, the court knew only that the boy had "admitted to performing the physical act of throwing the rock at the car." Id. at 87. The court reasoned that the boy's act could have been prompted by the desire to injure the car's occupants or, alternatively, could have been intended "merely to frighten the occupants of the car." Id. In remanding the case, the court noted that "crucial factual issues concerning [the boy's] state of mind and the surrounding circumstances remained unresolved and required further exploration." Id. at 88. It also noted that the boy's adjudication of delinquency for committing an assault and battery by means of a dangerous weapon was not conclusive as to the coverage issue since a "conviction of assault and battery by means of a dangerous weapon requires proof only that the defendant intentionally and unjustifiably used force, however slight, upon the person of another, by means of an instrumentality capable of causing bodily harm. Id. at 87 n.4.

Second, Morrell likens this case to Preferred Mut. Ins. Co. v. Gamache, 42 Mass. App. Ct. 194 (1997), aff'd, 426 Mass. 93 (1997). In Gamache, an officer attempted to arrest Gamache, who was an "insured" under the insurance policy. Id. at 195. In resisting the arrest, Gamache swung his arms, kicked his feet and dropped to the ground. Id. Gamache then grabbed onto the police officer's utility belt, causing the officer to lose his balance and fall, seriously injuring his knee. Id. The court reversed summary judgment for the insurance company, holding that Gamache's actions did not fall within any category of conduct for which an intention to injure is inferred as a matter of law. Id. at 200. The court also noted that Gamache's conduct was "arguably more neutral" than the conduct of the insureds in Talhouni and Abernathy. Id. at 200-01.

To decide whether this case falls within the first or second strand of cases described in Talhouni, the Court must consider the specific, admissible evidence in the record about the incident

13

on October 18, 2016, in the light most favorable to the non-movant, Morrell. See Mariasch v. Gillette Co., 521 F.3d 68, 70 (1st Cir. 2008). Viewed through this lens, the facts can be summarized as follows. When Proietti and Taylor tried to put handcuffs on Isaac, Isaac "panicked" and ran into the hallway, with the intention of escaping from the police. Because the hallway into which Isaac ran is not large enough to fit two people side by side, Isaac had to cross paths with Morrell to escape. As Isaac tried to pass Morrell, Morell grabbed Isaac by the side and then from the back. Malatos then joined Morrell in his efforts to restrain Isaac and the two officers tackled Isaac into the china cabinet. Isaac continued to struggle, with the intention of escaping the officers. It was not until Isaac had almost reached the living room, at the end of the hallway, that Morrell's hand was crushed against the wall.

The Court concludes that this case is more similar to those in the second strand, in which summary judgment was denied, than those in the first strand, for two main reasons. First, the similarities between this case and Gamache are striking. Both cases involve criminal suspects who injured police officers in a home in the course of resisting arrest, and Amica has failed to provide any persuasive reason why the Court should depart from the analysis in Gamache.[4] Second, like in Gamache and Abernathy, here Isaac's actions could be interpreted in at least two rational ways. In such cases, the Court can interpret the exception to the Policy "as focusing on either the insured's intent to act or the insured's intent to cause harm." Gamache, 42 Mass. App. Ct. at 199. Where two interpretations are possible, "the insured is entitled to the benefit of the one that is more

---

[4] Amica briefly argues that the cases are distinguishable because here, unlike in Gamache, the insured was not intoxicated. D. 45 at 17. In Gamache, the Appeals Court concluded that the question of intoxication on Gamache's ability to form the requisite intent was a disputed one for the jury. Id. at 201. The question of intoxication, however, was not dispositive, because the court had already determined that it would view the insurance policy exclusion as focusing on the nature of the act, rather than the injury, which posed an issue of disputed, material fact regarding Gamache's intent to injure. Id. at 199-200.

favorable to it." Id. (quoting Hazen Paper Co. v. U.S. Fid. & Guar. Co., 407 Mass. 689, 700 (1990)) (internal quotation mark omitted). The Court's conclusion here is consistent with the Supreme Judicial Court's opinion that "[t]he granting of summary judgment in a case where a party's state of mind or motive constitutes an essential element of the cause of action is disfavored." Abernathy, 393 Mass. at 86; see Liberty Mut. Fire Ins. Co. v. Casey, 91 Mass. App. Ct. 243, 246 (2017).

Finally, the Court rejects Amica's argument that it is entitled to summary judgment based on Isaac's guilty plea in the criminal case. Amica contends that Isaac's plea—specifically his agreement with the statements during the colloquy that he "violently thrash[ed] around," "resist[ed] arrest" and "commit[ted] an assault and battery on Officer Morrell"—establishes as a matter of law that his actions were intentional. D. 45 at 15. Assault and battery, however, is a general intent crime. See, e.g., Commonwealth v. Podkowka, 445 Mass. 692, 700 (2006). For a general intent crime, "there is no requirement that the Commonwealth must prove the defendant had a specific intent to injure the victim." Commonwealth v. Ford, 424 Mass. 709, 711 (1997); cf. Abernathy, 393 Mass. at 84 (noting that "the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm . . . "). Furthermore, "[t]he crime of assault and battery is defined as the intentional and unjustified use of force upon the person of another, however slight . . . ." Commonwealth v. Moore, 36 Mass. App. Ct. 455 (1994) (citation and internal quotation marks omitted). Accordingly, Isaac's plea shows only that he used some amount of force, "however slight," on Morrell. The Court recognizes that Isaac may be cross-examined about his intentions on October 18, 2016, but it is the role of the jury to resolve that factual dispute at trial.

15

## VI. Conclusion

For the foregoing reasons, the Court DENIES Amica's motion for summary judgment, D. 43.

**So Ordered.**

                                                                              <u>/s/ Denise J. Casper</u>
                                                                              United States District Judge